IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:21-CV-00045-FL

| | |
|---|---|
| **Mitchell Garnet Evans**, Executor of the Estate of Sallie Copeland Evans,<br><br>        Plaintiff,<br><br>v.<br><br>**United States**,<br><br>        Defendant. | **Memorandum & Recommendation** |

      This case asks the court to determine whether the United States can be held liable for the death of Sallie Evans. While Sallie was allegedly shot to death by her grandson, Isaiah Ceaser, her estate maintains that the United States' negligence led to this tragic outcome.

      In March 2018, Ceaser, a Lance Corporal in the United States Marine Corps, was supposed to be at a training school with his unit at Fort Benning, Georgia. But he left Georgia without permission, leaving behind writings that suggested he wanted to harm himself and others.

      Ceaser ended up in Halifax County, North Carolina near his family. Over the next several weeks his family repeatedly (and unsuccessfully) attempted to get the Marine Corps to take custody of him.

      Ultimately, Ceasar's commanding officer told Sallie that she should take Ceaser to Marine Corps Base Camp Lejeune. And it was while Sallie was attempting to persuade Ceaser to go with her that she was murdered. The amended complaint alleges that the Marine Corps acted negligently by not taking custody of Ceaser and by not protecting Sallie from him.

The United States now asks the court to dismiss the complaint for lack of subject matter jurisdiction and, alternatively, for failure to state a claim. It claims that it is immune from suit and that the amended complaint fails to state a negligence claim.

The United States is correct that its sovereign immunity deprives the court of subject-matter jurisdiction over the Estate's claims. While the Federal Tort Claims Act provides a limited waiver of the United States' sovereign immunity, that waiver does not apply to the Estate's claims. The basis for imposing liability on the United States is directly related to Ceaser's status as government employee, so this claim is barred by the FTCA's intentional tort exception. Thus the district court should grant the United States' motion to dismiss.

## I. Background

In March 2018, Isaiah Ceaser was stationed at Fort Benning in Georgia to attend combat training school with his unit. Am. Compl. ¶¶ 9, 10. At the end of the month, he left Georgia without permission and made his way to North Carolina. *Id.* ¶¶ 10, 12. Among the things that Ceaser left behind at Fort Benning was "a note stating that he was going to end it all and kill himself." *Id.* ¶ 10. Ceaser's commanding officer, Captain Smith, learned about the note. *Id.* ¶ 10.

In response, a sergeant in Ceaser's unit contacted law enforcement in Nash County, North Carolina where some of Ceaser's acquaintances lived. *Id.* He shared that "Ceaser had gotten into trouble and left a note indicating that he was going to end it all[.]" *Id.* ¶ 11. The note also stated that Ceaser wanted to visit his mother who was at an inpatient medical facility in Halifax County, North Carolina. *Id.*

Several of Ceaser's family members called Smith to let him know that Ceaser was in North Carolina "and needed to be picked up by the Marine Corps[.]" *Id.* ¶ 12. In response, Smith arranged

2

for Ceaser to fly from North Carolina back to Georgia. *Id.* ¶ 13. Ceaser boarded the flight, but within a few days he returned to his grandfather's home in Halifax County. *Id.* ¶¶ 14, 15.

Upon Ceaser's return to the area, his family members again reached out to Smith. *Id.* ¶ 16. They told him that Ceaser was in Halifax County and that they "were concerned and afraid something could happen." *Id.* ¶ 16. Sallie asked Smith why the Marine Corps had not apprehended Ceaser and asked if Smith could have local law enforcement pick Ceaser up. *Id.* ¶ 17.

Sallie, along with her daughter-in-law, spoke to Smith again the next day. Smith shared that Ceaser was under investigation for fraud. *Id.* ¶ 18. He also told them he had found several "disturbing" letters and notes from Ceaser. *Id.* These writings revealed that Ceaser intended to harm himself and others. *Id.* Smith said that he was "very concerned" by the notes and advised Sallie to be careful around Ceaser. *Id.*

That same day, Sallie again reached out to Smith. *Id.* ¶ 19. She asked "Smith to have Ceaser detained." *Id.* He said that the Marine Corps had exhausted substantial resources trying to pick Ceaser up at the airport and would not commit to doing anything else. *Id.* ¶ 19.

A few days passed and Ceaser's family again called Smith to ask why Ceaser had not yet been picked up. *Id.* ¶ 20. They told him that they had found grenade parts that they believed belonged to Ceaser. *Id.* They also shared that Ceaser was acting aggressively, was easily agitated, and was posting on social media that he had purchased guns. *Id.* Despite acknowledging that these were concerning developments and saying that he "would see what he could do," Smith would not commit to doing anything in particular. *Id.*

Then, about three weeks after he arrived in North Carolina, Ceaser's family once again took him to the airport so he could fly back to Georgia. *Id.* ¶ 21. Ceaser boarded the flight and his family then called Smith. *Id.* ¶¶ 21, 22. They told him that Ceaser was on a plane to Atlanta and

would need to be picked up at the airport. *Id.* ¶ 22. Smith eventually responded that "he could not have Ceaser detained at the airport, and Ceaser would need to" make his own way back to Fort Benning. *Id.*

But rather than make his way to Fort Benning, Ceaser made his way back to North Carolina the next day. *Id.* ¶ 23. Sallie once again contacted Smith and expressed her frustration with the situation and her concern that something bad would happen. *Id.*

In response, Smith told Sallie to take Ceaser to Camp Lejeune. *Id.* As Sallie was trying to persuade Ceaser to pack up and go with her to Camp Lejeune, he fatally shot her. *Id.* ¶ 26.

Sallie's estate sued the United States for wrongful death. In the amended complaint Evans alleges that the Marine Corps breached its duty, and thus was negligent, when it repeatedly failed to apprehend Ceaser. *Id.* ¶ 48. It also claims that since Smith instructed Sallie to take Ceaser to Camp Lejeune, the United States had a duty to protect her from Ceaser while she was doing so. *Id.*

The United States moved to dismiss the amended complaint arguing that the court lacks subject-matter jurisdiction because this claim is outside the scope of the FTCA. Alternatively, the Government argues that Evans has failed to state a claim because the United States did not breach a duty to Sallie. Mot. to Dismiss, D.E. 18; Mem. in Supp., D.E. 19 at 1.

## II. Discussion

The United States generally enjoys sovereign immunity against civil tort claims. *Kerns* v. *United States*, 585 F.3d 187, 193–94 (4th Cir. 2009). What this means is that courts lack jurisdiction to hear cases against the United States except when it has consented to being sued. *F.D.I.C.* v. *Meyer*, 510 U.S. 471, 475 (1994).

In its motion, the United States claims that it has not consented to be sued for the type of claim the Estate brought, so the court lacks subject-matter jurisdiction over this dispute. Since the United States' motion challenges the sufficiency of the allegations in the amended complaint, the court will accept the allegations as true just as if this were a motion to dismiss for failure to state a claim. *Adams* v. *Bain*, 697 F.2d 1214, 1219 (4th Cir. 1982). The Estate must show that its factual allegations establish subject matter jurisdiction. *Id.* at 1219 ("The burden of proving subject matter jurisdiction . . . is on the plaintiff, the party asserting jurisdiction.").

The parties dispute whether the Estate's claim falls within the waiver of sovereign immunity provided by the FTCA. Under that Act, federal courts have exclusive jurisdiction over civil actions against the United States seeking monetary damages for, among other things, wrongful death "caused by the negligent or wrongful act or omission of any employee of the Government while acting withing the scope of his office or employment." 28 U.S.C. § 1346(b)(1).

But that waiver of sovereign immunity does not apply to all tort claims. The United States has retained its immunity for "[a]ny claim arising out of assault, battery," and other intentional torts. 28 U.S.C. § 2680(h). This provision is known as the intentional tort exception. So, for example, the FTCA would not allow this court to hear a claim against the United States based directly on Ceaser's alleged murder of Sallie. *See United States* v. *Sheridan*, 487 U.S. 392, 398 (1988) (noting § 2680(h) "[is] unquestionably broad enough to bar all claims based *entirely* on an assault or battery.").

But, according to the Supreme Court, the FTCA does allow courts to hear some claims against the United States for injuries arising out of an assault or battery. The intentional tort exception does not apply when the government "negligently allow[s] the assault to occur" and the

5

assailant's "employment status. . .has nothing to do with the basis for imposing liability on the Government[.]" *Id.* at 389, 402.

*Sheridan* provides an example of how this exception can apply. In that case a naval medical aide, Carr, got drunk after finishing his shift at the hospital. *Id.* at 395. He gathered his belongings, including a rifle and ammunition, and left his quarters. *Id.* Three naval corpsmen later found Carr drunk and lying face down in the hospital. *Id.* They tried to take him to the emergency room, but he resisted. *Id.* As Carr began to flee, the corpsmen saw a rifle in his bag. *Id.* Though regulations that required the corpsmen to report the presence of firearms on the premises, they left the scene without taking any further action. *Id.* Carr later shot into a car, injuring a person and damaging the car. *Id.* The injured party sued the government under the theory that the corpsmen acted negligently when they allowed Carr to leave the hospital with a loaded rifle.

While the injury arose out of an assault by a government employee, the Supreme Court found that the claim could proceed under the FTCA. It held that the intentional tort exception did not apply because the basis for the United States' liability was "entirely independent of [the assailant's] employment status." *Id.* at 401. It noted that the firearms regulations "prohibit[ed] the possession of firearms on the naval base and that require[d] all personnel to report the presence of any such firearm[.]" *Id.* at 401. So "the government's liability resulted not from the mere fact that it was [the assailant's] employer, but rather from the fact that it had undertaken 'good Samaritan' responsibilities to ensure that nobody on the naval base possessed a firearm without authorization and that visibly drunken and dangerous persons were restrained." *Bembenista* v. *United States*, 866 F.2d 493, 497 (D.C. Cir. 1989). Thus the corpsmen were under a duty to report anyone who possessed a firearm, regardless of their employment status, and were under a duty to restrain anyone who was visibly drunk and dangerous, even if they were a private citizen.

6

So whether this court has jurisdiction over the Estate's claims turns on whether Smith's alleged negligence was independent of Ceaser's status as a Marine. The records proves that it was not.[1]

The Estate's theory of the case revolves around Ceaser's status as a Marine. The central theme of the amended complaint is that the Marine Corps could have and should have taken Ceaser into custody or asked local law enforcement to do so. *See* Am. Compl. ¶¶ 12, 17, 20, 22, 23, 30, 31, 33. And the military can do so with respect to service members who are considered absentees or deserters. *See* Department of Defense Instruction on Desertion and Unauthorized Absence, No. 1325.02 (Mar. 31, 2017). But the Estate has identified no authority allowing or requiring the Marine Corps to arrest or arrange for the arrest of a civilian who left their job without authorization. And when asked what legal authority would authorize the Marine Corps to control someone independent of their status as a Marine, the Estate responded, "[Ceaser] was AWOL and. . .normally you can't just go out and arrest somebody, but he was AWOL, so they could." Hr. Tr. at 6:14–18. So the basis for imposing liability on the United States implicates Ceaser's status as a Marine.

Ceaser's military status is just as relevant to the Estate's arguments about Smith instructing Sallie to take Ceaser to Camp Lejeune. Ceaser's family repeatedly reached out to a military officer about what to do with a service member who had left his duty station without permission from his chain of command. The answer they received was to take the service member to a military base. There is no reason to believe that the military would help Sallie deal with Ceaser if not for his

---

[1] At various places the amended complaint asserts that the United States had the ability to control or seize Ceaser for reasons independent of his status as a Marine. *See, e.g.*, Am. Compl. ¶¶ 40, 44, 45, 46. These allegations are not entitled to the presumption of truth because they are legal conclusions. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).

military status. And there is no reason that Smith would have told Sallie to take Ceaser to Camp Lejeune if not for his military status.

As with its earlier argument, the Estate concedes these points. When asked why Sallie contacted Smith, the Estate said that "she wanted the Marines to pick him up or notify law enforcement officials." Hr. Tr. at 11:17–20. And it also recognized that Smith "[c]ertainly. . .wouldn't have said, take a civilian to Camp Lejeune." *Id.* a 11:21–12:8.

The Estate has not met its burden to show that Ceaser's employment status has nothing to do with the basis for imposing liability on the United States. So the Estate cannot rely on *Sheridan* to avoid the FTCA's intentional tort exception. Thus the court lacks subject-matter jurisdiction over the Estate's claim and it should be dismissed.

In an attempt to avoid this conclusion, the Estate points to two cases applying Sheridan: *Durden* v. *United States*, 736 F.3d 296 (4th Cir. 2013) and *Lumsden* v. *United States*, 555 F. Supp. 2d 580 (E.D.N.C. 2008). But neither case requires a different outcome here.

*Durden* involved an FTCA claim based on an Army specialist named Purnell drunkenly breaking into Durden's home and raping her. 736 F.3d 296. Durden claimed that the Army knew "Pernell posed a safety risk to others, had a duty to protect her from Pernell, and breached that duty by failing to execute. . .orders that. . . required that Pernell be escorted at all times while on Fort Bragg and be checked on hourly when in his barracks." *Id.* at 300. The government moved to dismiss the case for lack of subject-matter jurisdiction and for failing to state a claim. *Id.* at 298. The district court dismissed the complaint for lack of subject matter jurisdiction and Durden appealed. *Id.* at 298–99.

The Fourth Circuit's opinion proceed in two parts. To begin with, it began by considering "whether, under North Carolina law, the Army owed any duty to Durden and, if it did, whether it

8

breached that duty." *Id.* at 301. It then moved on to the district court's alternate holding that it lacked subject matter jurisdiction due to "the FTCA's intentional-tort exception." *Id.* at 308.

Since the outcome here turns on the intentional tort exception, only the latter portion of the Fourth Circuit's opinion is relevant to the analysis. The appellate court's holding with respect to the intentional tort exception was that "although the government's ability (i.e., legal duty) to control a tortfeasor must be independent of the tortfeasor's status as a government employee, knowledge of the tortfeasor's propensity for violence or criminal history gained as a result of such status does not, per se, nullify an FTCA claim." *Id.* at 309. Since this case does not present a similar issue, *Durden* does not compel a different conclusion.

*Lumsden* is just as unhelpful to the Estate's argument. That case involved a claim that the United States was liable for a Marine Corps private getting into a fatal crash after driving while intoxicated. 555 F. Supp. 2d 580, 582 (E.D.N.C. 2008). The complaint alleged that the Marine Corps knew that the private "had, on several occasions, acquired and inhaled the chemical compound, ether, belonging to the Government." *Id.* In fact, the Marine Corps impounded the private's car after discovering him "inhaling ether that belonged to the United States." *Id.* After holding on to the car for about two weeks, the Marine Corps returned the car, which contained cylinders of ether, to the private. *Id.* The private then inhaled enough of the ether to become intoxicated, began driving, and ended up crashing into another car. *Id.*

The United States tried to have the case dismissed based on the FTCA's intentional tort exception. *Id.* at 584. The district court rejected this argument based on *Sheridan*. It noted that the plaintiff's theory of liability was based on government agents delivering both the car keys and ether to the private. *Id.* The court found that based on these facts, the private's "employment by

the Government is irrelevant to the plaintiffs' theory of liability." *Id.* So it held that the FTCA's intentional tort exception did not bar the plaintiffs' claim. *Id.*

*Lumsden* presents a straightforward application of *Sheridan*. The private's status as a government employee was irrelevant to the claims, so the intentional tort exception did not apply. But as discussed above, Ceaser's status as a Marine is at the heart of this case. So *Lumsden* does not suggest a different outcome here.

Instead, this case presents circumstances like those in *LaFrancis* v. *United States*, 66 F. Supp. 2d 335 (D. Conn. 1999). In that case, LaFrancis sued the government after she was assaulted by her former husband, a member of the United States Navy. *Id.* at 335–36. LaFrancis had reported to her husband's commanding officers that he had assaulted her and threatened her previously. *Id.* Eventually her husband was admitted to a psychiatric facility, yet he continued to threaten her during that time. *Id.* She told his commanding officers that she was afraid he would harm her when he left the facility and asked the Navy to take measures to protect her. *Id.* Allegedly, the Navy told LaFrancis that it would issue a no-contact order directing LaFrancis's husband not to return to the residence once released. *Id.* But that order was never issued. *Id.* at 337. And when he was released, he assaulted LaFrancis causing several injuries. *Id.*

LaFrancis alleged that the government was negligent in failing to issue the appropriate orders and try to ensure LaFrancis's husband did not assault her. *Id.* at 341. She argued that the Navy owed her a duty to protect her that independent of her husband's employment. *Id.* But the court disagreed, concluding that the duty to her was dependent on her husband's employment with the government because "the control over [her husband] by his superiors was dependent upon that employment relationship." *Id.* Without it, "the Navy would not have had the authority to supervise the conduct of [her husband] or to issue the 'no contact order.'" *Id.*

10

Just like in *LaFrancis*, Smith's ability to control or detain Ceaser was dependent on his employment relationship with the United States. Without that relationship, there would have been no basis for Smith to arrange for Ceaser's arrest or to suggest he be returned to Camp Lejeune. So just like in *LaFrancis*, the Estate has failed to show that it's claims are independent of Ceaser's employment status. That shortcoming requires the court to dismiss the case for lack of subject matter jurisdiction.[2]

### III. Conclusion

For the reasons described above, the court lacks subject-matter jurisdiction over this case. Thus it should grant the United States' motion and dismiss this action. D.E. 18.

The Clerk of Court must serve a copy of this Memorandum and Recommendation ("M&R") on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: June 6, 2022

_____
Robert T. Numbers, II
United States Magistrate Judge

---

[2] Due to this conclusion, this opinion will not address the United States' alternative argument that the amended complaint's allegations fail to state a negligence claim.